In re HUDSON RIVER POWER TRANSMISSION CO.

(Circuit Court of Appeals, Second Circuit.  December 12, 1910.)

Nos. 180–183.

BANKRUPTCY (§ 72*)—CORPORATIONS SUBJECT TO ACT—PUBLIC SERVICE CORPORATIONS.

Bankr. Act July 1, 1898, c. 541, § 4, 30 Stat. 547 (U. S. Comp. St. 1901, p. 3423), as amended by Act Feb. 5, 1903, c. 487, § 3, 32 Stat. 797 (U. S. Comp. St. Supp. 1909, p. 1309), does not include in the classes of corporations thereby made subject to the act public utility corporations, such as gas and electric companies principally engaged in supplying means for lighting in cities and other communities.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 72.*

What persons are subject to bankruptcy law, see note to Mattoon Nat. Bank v. First Nat. Bank of Mattoon, 42 C. C. A. 4.]

Appeals from the District Court of the United States for the Northern District of New York.

Separate petitions in bankruptcy in the matter of the Hudson River Power Transmission Company, the Hudson River Electric Power Company, the Saratoga Gas, Electric Light & Power Company, and the Hudson River Electric Company.  Petitions dismissed, and the petitioners appeal.  Affirmed.

For opinion below, see 173 Fed. 934.

These causes come here on appeals from decrees of the District Court dismissing petitions in involuntary bankruptcy filed against the companies above numerated.  The opinion of the District Judge will be found in 173 Fed. 935.

C. C. Lester, for appellants.

A. J. Rose and George B. Curtiss, for receivers.

J. A. Van Voast, for Schenectady Trust Company.

C. E. Hotchkiss, for trustees of the mortgages.

Before LACOMBE, COXE, and WARD, Circuit Judges.

LACOMBE, Circuit Judge (after stating the facts as above).  Various points have been discussed upon the argument, but under the view we take of the questions presented this discussion may be confined to one subject only.  It will be necessary first to state precisely what is the business of each company.

The Saratoga Gas, Electric Light & Power Company was incorporated under the transportation corporations law of the state of New York, having authority under its charter and franchises to lay down, erect, or maintain wires, pipes, conduits, or other fixtures in, over, or under the streets, highways, and public places of the village of Saratoga Springs, for the purpose of furnishing or distributing gas, or furnishing or transmitting electricity for light, heat, or power, or maintaining underground conduits or ducts for electrical conductors. At the time petition was filed it was engaged in making gas at a plant which it maintained in Saratoga Springs.  It also purchased electricity from a corporation known as the Hudson River Water

Power Company. This gas and electricity it distributed through mains and wires for lighting the streets, avenues, public parks, and public and private buildings in the village. It also had a supply store for the furnishing of gas and electric light fixtures and appliances. This, however, was a mere incidental activity, amounting to a very small part of its business. The pursuit in which it was principally engaged was the public and private lighting aforesaid, by means of the gas and electrical current which it made or bought.

The Hudson River Electric Company was incorporated under the transportation corporations law of the state of New York, having authority under its charter and franchises to lay down, erect, or maintain poles, wires, pipes, conduits, ducts, or other fixtures in, over, or under the streets, highways, and public places of the cities, villages, and towns in the counties of Warren, Saratoga, and the adjoining counties, for the purpose of furnishing or transmitting electricity for light, heat, or power and of maintaining underground conduits or ducts for electrical conductors. It did not own a generating plant, buying electric current from the Hudson River Electric Power Company. It owned transmission lines, with various substations and switch houses, and was engaged in the distribution of electrical energy in the cities of Glens Falls, Watervliet, and Cohoes, not only to private consumers, but also to the municipalities, for the lighting of public streets, parks, and buildings.

The Hudson River Electric Power Company was also incorporated under the transportation corporations law of New York, its object being to conduct in the state of New York the business of generating and dealing in electricity; the use of electricity for light, heat, and power; the carrying on of the business of "lighting by electricity and using it for heat and power in cities, towns, and villages within the state and the streets, avenues, and public places thereof, and public and private buildings therein." It had an electric power plant at Utica, also transmission line from Utica to Clark's Mills, and tower transmission line from Ballston Spa to Amsterdam. It supplied electricity to other companies belonging to the group now under consideration and to one or more electric railroads. Except for a small proportion which it got from the Kane's Mills Company, it generated all the electricity it supplied. It held franchises in Johnstown, Little Falls, Ft. Plain, and Nelliston. It was engaged in furnishing public street lighting. It held the whole or a controlling interest in the stock of the other companies of the group, and conducted the whole as one business enterprise.

The Hudson River Power Transmission Company was also organized under the transportation corporations law for the development, use, sale, and transfer of electric power, light, and heat. It had a generating plant at Mechanicsville and various transmission lines. It supplied power to the United Traction Company, which runs cars in Albany, Troy, Cohoes, and Watervliet, and through the Albany Electric Illuminating Company furnished light and power both to the public and to private individuals in the city of Albany.

The District Judge held that these corporations were not such as could be made bankrupts under the act of 1898 (Act July 1, 1898,

c. 541, 30 Stat. 545 [U. S. Comp. St. 1901, p. 3418]) and its amendments.

Various arguments are advanced in support of this decision. It is contended that whether or not companies manufacture or trade in gas or electricity, the dominant and characteristic feature of their activity is the transportation of the light-producing substance, which they obtain through their wires or ducts to the individual points of consumption; and it is pointed out that the state of New York by legislative action has expressly classified corporations for manufacturing and supplying gas, or for manufacturing and using electricity for producing light, heat, or power, and in lighting streets, avenues, public parks, and other places, and public and private buildings of cities, villages and towns, within the state as "transportation corporations." Chapter 566, Laws 1890. See, also, Public Service Commissions Law, as amended by chapter 480, Laws 1910 (Consol. Laws, c. 48).

It is contended that the generating of electricity is not technically a manufacture, and that the buying and selling of illuminating gas and electricity is not properly a trading or mercantile pursuit, which terms it is insisted should be restricted to dealings in merchandise, goods, or chattels, the ordinary subjects of commerce.

Without considering these several arguments, we find sufficient reason to sustain the decrees in the peculiar character of these companies. If they do manufacture and do trade, they do much more. Under authority conferred by the state and by various local authorities they are "principally engaged" in supplying the means whereby streets, avenues, and public places in the state are lighted and the public safety and comfort thereby promoted. They are corporations of "public utility." and if they did not themselves light these localities the public authorities would no doubt be constrained to do so themselves. By reason, moreover, of the circumstance that they are given this authority, with, to a certain extent, the right of exercising eminent domain, they are correlatively charged with a duty to the public, which is no part of the obligations of ordinary corporations engaged in "manufacturing, trading, printing, publishing, mining or mercantile pursuits." And as a result, when financial adversity overtakes them, there are interests which have to be considered other than those which require attention when the ordinary corporation of the enumerated classes becomes insolvent.

In the case of an ordinary manufacturing or trading corporation, the matters presented for disposition are in their last analysis merely the disposition of dollars and cents. The assets are to be realized and their proceeds distributed among creditors of different classes, and the residue, if any, to owners. But in the case of a "public utility" corporation, such as these, the public itself, the community in which the corporation is rendering service, has a right superior even to creditors of every class, and which right cannot be extinguished by the payment of a dividend in money. With the power to terminate franchises for failure to discharge the obligations inherent in their grant, the state or local authorities can destroy what is usually the most valuable asset of the defaulting company, against the wishes of all

creditors, and before the latter might succeed in finding an assignee of the franchise satisfactory to local authorities who would assume the burden and perhaps pay something for the transfer. Moreover, the public safety and comfort imperatively demand that, whatever else may happen, the corporation, devoid of ready cash though it be, shall not make default on its public obligations, with the result of plunging the community in darkness or stopping the transportation of passengers, and that in some way or other the public service shall be rendered while the financial affairs of the company are being wound up. There are no indications in the bankrupt act that Congress intended to arrange any administrative machinery competent to accomplish these results. On this branch of the case the opinion of Judge Ray is especially illuminative, when it is remembered that he was chairman of the House judiciary committee when the bankrupt act was passed. He says:

"There was a serious and wide difference of opinion in the committee on the judiciary and in the Congress itself whether corporations, any corporation, should be brought under the operation of the law. There was a feeling on the part of some that railroad corporations should be included, if any were. But when it was considered that railroads are the arteries of commerce and transportation, state and interstate, created by state laws in the main, and extending with their connecting lines from state to state and lakes to gulf under merger and consolidation agreements, it was seen that, to properly administer the property of such corporations in the bankruptcy courts and under a bankruptcy law, it would be necessary to make many special and extraordinary provisions for those cases, if the public service was to be considered and the interests of the public conserved."

We have been referred to some dicta and to the expressions of some text-writers (In re Bay City Irrigation Co. [D. C.] 135 Fed. 850; In re New York & Westchester Water Co. [D. C.] 98 Fed. 711; Collier on Bankruptcy [6th Ed.] 71; Remington on Bankruptcy, § 89), but the point raised here has never been decided. So far as we can ascertain, no corporation engaged in rendering public service has been made an involuntary bankrupt, which may be some indication of the general understanding as to the scope of section 4 of the bankruptcy act. We are of the opinion that Congress had no intention to include corporations such as these now before us in the enumeration of that section, either as it originally stood or as it was amended in 1903.

The decrees are affirmed.